UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT

OF MICHIGAN SOUTHERN DIVISION

ERIN PARKES & JOSEPH PALERMO,

                                Case No: 20-cv-12650
                                HONORABLE DENISE PAIGE HOOD

        Plaintiffs,

v

RODNEY ROBERT WYNNE,

        Defendant.

| | |
|---|---|
| CHRISTOPHER S. OLSON (P58780) | JEANNE V. BARRON (P37138) |
| OLSON PLLC | RAFTERY & BARRON, P.C. |
| **Attorney for Plaintiffs** | **Attorneys for Defendant** |
| 32121 Woodward Ave., Suite 300 | 32901 Middlebelt Road, Suite 500 |
| Royal Oak, MI 48073 | Farmington Hills, MI 48334 |
| (248)672-7368 | (248)538-2400 |
| colson@olsonpllc.mygbiz.com | jeanne@rjhlaw.com |

<u>DEFENDANT, RODNEY ROBERT WYNNE'S, MOTION
FOR SUMMARY JUDGMENT</u>

NOW COMES, Defendant RODNEY ROBERT WYNNE, by and through his

attorney, RAFTERY & BARRON, and for his Motion for Summary Judgment as

follows:

1. Plaintiffs ERIN PARKES and JOSEPH PALERMO filed three count Complaint against

Rodney Wynne alleging: 1) Violation of Civil Rights under 42 USC §1983 and Fourth

Amendment 2) Conversion and 3) Intentional Infliction of Emotional Distress.

2. Plaintiffs PARKES and PALERMO allege a wrongful taking of their property when their dog was shot by Defendant, RODNEY WYNNE, an off-duty police officer.

3. Defendant WYNNE is entitled to summary judgment for the for the following reasons:

    a. Defendant WYNNE was not acting under the color of law at the time the dog was shot, but out of personal and private interest;

    b. The use of deadly force was reasonable given the imminent danger posed by the dog, and therefore, no taking occurred;

    c. There was no Conversion because force was not wrongfully exerted;

    d. Plaintiffs cannot recover for Intentional Infliction of Emotional Distress as a consequence of property damage under Michigan law.

    e. The Plaintiffs are unable to establish that Defendant engaged in extreme or outrageous conduct:

and

    f. The Plaintiffs are unable to establish that they suffered severe emotional distress.

    WHEREFORE, Defendant, RODNEY WYNNE, respectfully requests that this Honorable Court grant his Motion for Summary Judgment pursuant to Fed.R.Civ.P 12(b)6 and Fed.R.Civ.P. 56, dismiss Plaintiff's Complaint with prejudice, as well as award Defendant costs and attorney fees for having to defend this matter.

Respectfully Submitted,

RAFTERY & BARRON P.C.

/s/: Jeanne V. Barron
JEANNE V. BARRON (P37138)
Attorney for Defendants
32901 Middlebelt Road, Suite 500
Farmington Hills, Mi 48334
(248) 538-2400

Dated: September 16, 2021

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT

OF MICHIGAN SOUTHERN DIVISION

ERIN PARKES & JOSEPH PALERMO,

Case No: 20-cv-12650
HONORABLE DENISE PAIGE HOOD

Plaintiffs,

v

RODNEY ROBERT WYNNE,

Defendant.

| | |
|---|---|
| CHRISTOPHER S. OLSON (P58780) | JEANNE V. BARRON (P37138) |
| OLSON PLLC | RAFTERY & BARRON, P.C. |
| **Attorney for Plaintiffs** | **Attorneys for  Defendant** |
| 32121 Woodward Ave., Suite 300 | 32901 Middlebelt Road, Suite 500 |
| Royal Oak, MI 48073 | Farmington Hills, MI 48334 |
| (248)672-7368 | (248)538-2400 |
| colson@olsonpllc.mygbiz.com | jeanne@rjhlaw.com |

<u>**BRIEF IN SUPPORT OF DEFENDANT RODNEY WYNNE'S MOTION FOR**</u>
<u>**SUMMARY JUDGMENT PURSUANT TO FED. R.CIV.P.12(b)6 & FED.R.CIV.P. 56**</u>
**\*\*ORAL ARGUMENT REQUESTED\*\***

# TABLE OF CONTENTS

Table of Contents...............................................................................................................i

Index to Authorities.........................................................................................................iii

List of Exhibits..................................................................................................................v

Statement of Issues Presented.........................................................................................vi

Most Controlling Authority.............................................................................................vii

Statement of Facts.............................................................................................................1

Standard of Review..........................................................................................................11

Argument.........................................................................................................................12

I.  The Court should Grant Defendant Rodney Wynne's Motion for Summary Judgment as Officer Wynne was not acting as a police officer under color of law at the time he shot the dog...............................................................................................................................12

II. The Court should Grant Defendant Rodney Wynne's Motion for Summary Judgment as the force used was reasonable given the imminent danger posed by the dog, and therefore, no taking occurred.................................................................................................15

III. The Court should Grant Defendant Rodney Wynne's Motion for Summary Judgment as force was not wrongfully exerted, therefore there is no conversion.................................18

IV. The Court should Grant Defendant Rodney Wynne's Motion for Summary Judgment as Plaintiffs cannot recover for Intentional Infliction of Emotional Distress as a consequence of property damage under Michigan law.............................................................19

V. The Court should Grant Defendant Rodney Wynne's Motion for Summary Judgment Plaintiffs are unable to establish that Defendant engaged in extreme or outrageous conduct.............................................................................................................................20

VI.  The Court should Grant Defendant Rodney Wynne's Motion for Summary Judgment

because Plaintiffs are unable to establish that they suffered sever emotional distress.......21

Conclusion..............................................................................................................................23

<u>INDEX TO AUTHORITIES</u>

**Cases**

<u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (1964).............................................................vii, 11

<u>Guzowski v. Hartman</u>, 969 F.2d 211, 213 (6th Cir. 1992) .........................................................vii, 11

<u>Conley v. Gibson</u>, 355 U.S. 41, 45-6 (1957)..............................................................................vii, 12

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).................................................................vii, 12

<u>West v. Atkins</u>, 487 U.S. 42, 49-50, (1988)................................................................................12,16

<u>Waters v. City of Morristown</u>, 242 F.3d 353, 359,(6th Cir., 2001)...........................................12

<u>Smith v. Kennemore</u>, 2019 U.S. Dist. LEXIS 214334, *13, 2019 WL 6792754 ........................13

<u>Memphis, Tenn. Area Local, Am. Postal Workers Union v. City of Memphis</u>, 361 F.3d 898, 903, 86 Fed. Appx. 137 (6th Cir. 2004)...............................................................................13

<u>Layne v Sampley</u>, 627 F.2d 12, 12-13 (6th Cir. 1980) ..................................................................14

<u>Altman v. City of High Point</u>, 330 F.3d 194, (4th Cir. 2003)........................................14,16,18,21

<u>Brown v. Battle Creek Police Dep't</u>, 844 F.3d 556, (6th Cir. 2016).................... 14,16,17,18,21

<u>Stengel v. Belcher</u>, 522 F.2d 438, 440-41 (6th Cir. 1975)...........................................................14

<u>United States v. Place</u>, 462 U.S. 696, 703 (1983) .......................................................................16

<u>Graham v Connor</u>, 490 U.S.386, 297 (1989)...............................................................................16

<u>Ten Hopen v Walker</u>, 96 Mich. 236, 239; 55 N.W. 657 (1893)...................................................19

<u>Koester v VCA Animal Hospital</u>, 244 Mich. App. 173, 176, (2000)...................................... 19,20

<u>Thoma v. Tracy Motor Sales, Inc.</u>, 360 Mich. 434, 438, 104 N.W.2d 360 (1960)...................19

<u>Preston v. City of St. Clair Shores</u>, 2015 U.S. Dist. LEXIS 182423, 2015 WL 12516687 ...............................................................................................................................19,20

<u>Guzowski v. Detroit Racing Asso.</u>, 130 Mich. App. 322, 328, 343 N.W.2d 536, 540, (1983) .............................................................................................................................................19

<u>Davidson v. Michigan C. R. Co.</u>, 49 Mich. 428, 431; 13 N.W. 804, (1882)...............................19

iii

Saglioccolo v. Eagle Ins. Co., 112 F.3d 226, 233 (6th Cir.1997)...............................19

Hardrick v. City of Detroit, 2016 U.S. Dist. LEXIS 154642, *42, 2016 WL 6600039...........20

Moreno v. Hughes, 157 F. Supp. 3d 687, 2016 U.S. Dist. LEXIS 5697 ( E.D. Mich. January 19,2016)...................................................................................................................20

Hayley v Allstate Ins Co, 262 Mich App 571, 577; 686 NW2d 273 (2004).............................21

Atkinson v Farley, 171 Mich App 784, 789; 431 NW2d 95 (1988)................................................21

Lewis v LeGrow, 258 Mich App 175, 196; 670 NW2d 675 (2003)............................................21

Roberts v Auto-Owners Ins Co, 422 Mich 594, 602; 374 NW2d 905 (1985).......................22

**Statutes**

M.C.L. §§ 287.266.........................................................................................................19

M.C.L. §§ 287.268.........................................................................................................19

42 USC § 1983.........................................................................................................12,13,20

**Rules**

Fed.R.Civ.P 12(b)6.........................................................................................................vii, 11,23

Fed.R.Civ.P. 56.........................................................................................................vii,11,23

## LIST OF EXHIBITS

Deposition and Transcript of Defendant Rodney Wynne..........................................Exhibit A

Picture of the Palermo Home...............................................................................Exhibit B

Picture of Astro...................................................................................................Exhibit C

Deposition and Transcript of Erin Parkes............................................................Exhibit D

Deposition and Transcript of Joseph Palermo......................................................Exhibit E

Deposition and Transcript of Kalisha Hubler.......................................................Exhibit F

Deposition and Transcript of Audra Sanders........................................................Exhibit G

Deposition and Transcript of Claire Turkington...................................................Exhibit H

Deposition and Transcript of Christina Morgan....................................................Exhibit I

Deposition and Transcript of Brian Miller............................................................Exhibit J

Deposition and Transcript of Officer Stanson......................................................Exhibit K

Deposition and Transcript of Officer Cox.............................................................Exhibit L

Deposition and Transcript of Officer Taylor.........................................................Exhibit M

<u>STATEMENT OF THE ISSUES PRESENTED</u>

I.  Should the Court grant Defendant Rodney Wynne's Motion for Summary Judgment as Officer Wynne was not acting as a police officer under color of law at the time he shot the dog?

DEFENDANT ANSWER: YES
PLAINTIFF"S ANSWER: UNKNOWN

II. Should the Court grant Defendant Rodney Wynne's Motion for Summary Judgment as the force used was reasonable given the imminent danger posed by the dog, and therefore, no taking occurred?

DEFENDANT ANSWER: YES
PLAINTIFF'S ANSWER: UNKNOWN

III. Should the Court should grant Defendant Rodney Wynne's Motion for Summary Judgment as force was not wrongfully exerted and therefore there is no conversion?

DEFENDANT ANSWER: YES
PLAINTIFF'S ANSWER: UNKNOWN

IV. Should the Court grant Defendant Rodney Wynne's Motion for Summary Judgment as Plaintiffs cannot recover for Intentional Infliction of Emotional Distress as a consequence of property damage under Michigan law?

DEFENDANT ANSWER: YES
PLAINTIFF'S ANSWER: UNKNOWN

V. Should the  Court should grant Defendant Rodney Wynne's Motion for Summary Judgment Plaintiffs  are unable to establish that Defendant engaged in extreme or outrageous conduct?

DEFENDANT ANSWER: YES
PLAINTIFF'S ANSWER: UNKNOWN

VI.  Should the Court grant Defendant Rodney Wynne's Motion for Summary Judgment because Plaintiffs are unable to establish that they suffered sever emotional distress

DEFENDANT ANSWER: YES
PLAINTIFF"S ANSWER: UNKNOWN

## MOST CONTROLLING AUTHORITY

Defendants rely on the provisions of Fed. R. Civ. P. 12(b)(6), which state that in order to survive a motion to dismiss the plaintiff must show that her complaint is factually sufficient, and has an obligation is to provide the grounds of her entitlement to relief. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (1964). This requires more than labels and legal conclusions. Id. The Court must construe the complaint in the light most favorable to the nonmoving party, accept the nonmoving party's factual allegations as true. Guzowski v. Hartman, 969 F.2d 211, 213 (6th Cir. 1992). If the plaintiff is unable to prove any set of facts to support her claim for relief, the Court will dismiss the case. Id. (quoting Conley v. Gibson, 355 U.S. 41, 45-6 (1957)). Courts are not bound to accept as true a legal conclusion couched as a factual allegation. Twombly, 550 U.S. at 555 (internal citations omitted).

Further Defendants rely on the provision of Fed. R. Civ. P. 56 which states that "summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law". Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)(internal citations omitted). The United States Supreme Court has held that if a party fails to make a sufficient showing as to an essential element of her claim that party still bears the burden of proof at trial. Id. This entitles the moving party to a judgement as a matter of law because there is no genuine issue as to any material fact; the nonmoving party has failed to show an essential element of her claim, and bears the burden of proof to show all elements of that claim. Id. at 323.

<u>STATEMENT OF FACTS</u>

A review of the testimony of all of the parties and witnesses supports Defendant's argument that there is no genuine issue of material fact and Defendant is entitled to judgment as a matter of law.

*Testimony of Defendant Rodney Wynne*

On August 2, 2020, Rodney Wynne went to visit his girlfriend, Claire Turkington and a couple of her friends, Kalisha Hubler and Audra Sanders in Oak Park. (Exhibit A, Deposition of Rodney Wynne, Page 16).[1] It was a nice day out so the foursome decided to walk to Dairy Queen with Audra's pit bull puppy named Vinnie, and Kalisha's dog, Brody, a Golden retriever. Claire and Audra were walking at the front of the group with Rodney, Kalisha and the dogs walking behind them. (Exhibit A, 30-31). As the group walking past Plaintiffs' house they encountered Astro, the Plaintiffs' dog. (Exhibit A, Page 32) (Exhibit B, Picture of Palermo house). Astro came from behind, ran past Wynne and then attacked the puppy's neck. (Exhibit A, Page 34) (Exhibit C, Picture of Astro). He attacked Vinnie's neck aggressively and pinned him right to the ground and starting shaking him like <u>he was trying to tear the puppy apart</u>. (emphasis added). (Exhibit A, Page 35). Astro was <u>growling and dragging the puppy on the ground;</u> it looked like he was trying to hurt or kill the puppy. (emphasis added). (Exhibit A, 35-36). Wynne twice tried to kick Astro to get him off of the puppy; <u>Astro then lunged at Wynne.</u> (emphasis added). (Exhibit A, 39). Wynne tried to bat him away, and Astro mouthed Wynne's arm, but didn't actually bite him. (Exhibit A, 40). When Astro pinned the puppy again, Wynne drew his gun and fired twice killing Astro. When asked why he shot Astro,

---

[1]    Deposition of Rodney Wynne taken April 15, 2021 will be referenced to as Exhibit A with corresponding page number following "Exhibit A".

Wynne testified that he "feared for Vinnie's life...And I was afraid that he would either go after the other dog that was with us or attack one of the girls that was with me." (Exhibit A, 52).

*Testimony of Plaintiff Erin Parkes*

On the date of the incident, Erin Parkes was inside the house folding laundry with her daughter. (Exhibit D, Deposition of Erin Parkes, Page 43)[2]. Erin heard a commotion outside, yelling and screaming , and then a quick pop sound. (Exhibit D, Page 45). She ran to the dining room window to see what was going on. (Exhibit D, Page 45). She saw her dog, Astro, go down and saw her husband, Joe, running toward him. (Ex. D, Page 49). She then saw Wynne shoot Astro a second time. (Exhibit D, Page 53). She testified that she did not see Astro attack the puppy or put his mouth on Rodney Wynne. (Exhibit D, Page 50). At this point Erin ran out of the house to where the dog was. (Exhibit D, Page 53). She and Joe exchanged words with Wynne, and they took the dog to the vet. (Exhibit D, Page 54, 58).

At her deposition Erin testified that no one had complained about Astro's behavior.

> Q.  Prior to August 2nd, 2020 had anyone ever complained to you about Astro's conduct?
>
> A. No, not to me.
>
> Q. Are you aware of anyone complaining to Joe about Astro's conduct prior to August 2nd, 2020?
>
> A. No.

---

[2]     Deposition of Erin Parkes taken on Juy 12, 2021will be referenced to as Exhibit D with corresponding page number following "Exhibit D".

2

Q. No complaints that he had gotten outside, for example?

A. No. Exhibit C at 38: 16-23.

However, when asked directly about an attack that occurred between Astro and another neighbor, Christina Morgan, and her dog, Patsy, Erin admitted that she knew about this incident because another neighbor, Brian Miller, told her about it. (Exhibit D, Page 39). She said Brian told her that he had gone into the backyard to get a tool and that "he had an issue with some woman walking by and Astro got out of your fence. I basically left the door open. " (Exhibit D, Page 39,40) She testified that Brian told her that the dog was ok and that she didn't have any information on who the woman was so she couldn't follow up. (Exhibit D, Page 39). Erin was in the house at the time, and didn't witness the attack on Patsy for herself. (Exhibit D, page 40). She also claims Astro never got out of the yard prior to the incident with Christina Morgan. (Exhibit D, Page 41). However, It is clear from her testimony, therefore, that Plaintiff knew that Astro had: (1) gotten out of the yard before, and (2) was potentially dangerous. (emphasis added).

When asked if the dog attacking a puppy could indicate a dangerous animal, Erin demurred and said that "it could be for various reasons. I wouldn't say that it would mean you're harboring a dangerous dog. (Exhibit D, page 60, 63).

*Testimony of Plaintiff Joseph Palermo*

Joseph Palermo was in the garage on the date of the incident. (Exhibit E, Deposition of Joseph Palermo, Page 21).[3] The garage door was open to the driveway and he saw Rodney Wynne and the three women walking down the street. (Exhibit E, Page 21, 23). The next thing he heard was a scream and then a pop. (Exhibit E, Page 27). He

---

[3]  Deposition of Joseph Palermo taken on July 12, 2021 will be referenced to as Exhibit E with corresponding page number following "Exhibit E".

then ran out of the garage to see what was going on. (Exhibit E, Page 27). He then saw that Astro was in distress and saw Rodney Wynne take the second shot.(Exhibit E, Page 27). Wynne at that point identified himself as a police officer to Palermo. (Exhibit E, Page 31). There was shouting and words exchanged between the parties and then Erin and Joseph took the dog to the vet. (Exhibit E, Page 37, 42). Joseph states he didn't see the attack on Wynne or the puppy. He stated that one of the women had already picked up the puppy by the time he got to the scene. (Exhibit E, page 30) Joseph also denied there were any complaints about Astro's behavior or having any knowledge about the attack on Christina Morgan's dog. (Exhibit E, page 34).

*Testimony of Witness  Kalisha Hubler*

Kalisha confirmed Wynne's version of events. She stated that she and friends were walking the dogs, going to get ice cream. The dog burst out of the backyard and went straight for the puppy. (Exhibit F, Deposition of Kalisha Hubler, Page 13).[4] Kalisha testified that was screaming and panicking, trying to get the owner to come and get their dog. (Exhibit F, Page 14). She testified that there was no question in her mind that Vinnie, the puppy, was being attacked.  She was so focused on the dogs that she didn't even see Wynne take out his gun.  (Exhibit F, Page 16). She was close enough to the incident that she had blood on her shoes. (Exhibit F, Page 15).

At this point Erin Parkes came out of the house and Joe Palermo came from the garage. (Exhibit F, Page 17).  Everyone was still yelling. Erin and Joe wrapped Astro in a blanket and took the dog away (Exhibit F, Page 18). Shortly thereafter the police arrived and questioned the three girls and Wynne. (Exhibit F, Page 20).

---

[4]       Deposition of Kalisha Hubler taken on August 3, 2021  will be referenced to as Exhibit F with corresponding page number following "Exhibit F" .

*Testimony of Witness Audra Sanders*

Audra Sanders is Kalisha Hubler's roommate and friend and coworker of Claire Turkington. Both Audra and Claire work together as ER nurses at Beaumont Hospital. (Exhibit G, Deposition of Audra Sanders, Page 8-9).[5] She was walking with Wynne and the other girls on the date of the incident. Audra confirms she was walking in front with Claire, and Wynne and Kalisha were walking behind them. Audra testified that she heard a commotion and saw Astro pinning her puppy Vinnie to the ground. (Exhibit G Page 12). Audra confirmed that Wynne tried to kick Astro off of Vinnie; when the dog attacked again Wynne drew his gun. (Exhibit G, Page 12). Audra grabbed Claire and pulled her to the ground. (Exhibit G, Page 13). She wasn't facing the Astro for the first shot. When she looked back the Astro was still moving and Wynne shot the dog a second time. (Exhibit G, Page 13). After the dog stopped moving, and it seemed safe enough, Audra went and picked up Vinnie and carried him across the street. (Exhibit G, Page 13).

After the police arrived and took their statements, Audra and her friends were walking home when Mr. Palermo arrived back on the scene, and began shouting at Wynne. Audra said she was afraid he was going to pull a gun out. Everyone was shouting. Mr. Palermo went after Wynne and the police had to pull him off. (Exhibit G, Page 22). Audra testified that she didn't feel safe walking home; the friends took the long way back along 9 Mile road. (Exhibit G, Page 22).

---

[5]     Deposition of Audra Sanders taken on August 3, 2021  will be referenced to as Exhibit G with  corresponding page number following "Exhibit G"

Audra says she still feels anxious walking her dog. She testified that for a long time after the incident she didn't really leave her street, and she now carries a knife with her just to make herself feel safer. (Exhibit G, Page 16). This is how traumatic the experience with Plaintiff's dog was to an independent witness and member of the public.

*Testimony of Witness Claire Turkington*

Claire Turkington is a coworker of Audra Sanders and was dating Rodney Wynne on the date of the incident. She confirmed that the foursome including Kalisha Hubler were walking the two dogs, Vinnie, the puppy, and Brody, the Golden Retriever, and going to the Dairy Queen (Exhibit H, Deposition of Claire Turkington, Page 9)[6]. Claire stated she was walking ahead with Audra and Kalisha and Rodney were walking behind them with the dogs. Claire turned to tell Rodney something and she saw a "massive" dog come through the fence and immediately attack Vinnie and grab him by the neck. (Exhibit H, Page 10). Vinnie was dragged on his back and his feet were in the air. (Exhibit H, Page 10). Wynne kicked Astro to try to separate the dogs but it didn't work. Wynne kicked Astro a second time and that point he drew his gun and shot the dog. (Exhibit H, Page 11). Claire didn't see the second shot, she turned her head away. She testified, "I thought Vinnie was going to die." (Exhibit H, Page 11).

When asked if she could've intervened in the dog fight Claire said "she wouldn't have been comfortable pulling the dogs apart. I've seen a lot of serious injuries from people who have gotten bit by large dogs, so that's scary. I took care of a child who died from a dog bit to the neck." *(Exhibit H, Page 12)*.

---

[6] Deposition of Claire Turkington taken on August 3, 2021 will be referenced to as Exhibit H with corresponding page number following "Exhibit H".

6

At this point Wynne called 911 and the Joe and Erin came out of the house, very obviously upset. (Exhibit H, Page 12). They picked Astro up and put him in the car and drove away. (Exhibit H, Page 13). It was obvious to Claire that Astro had already died in the street although this may not have been obvious to Joe and Erin. (Exhibit H, Page 13).

The police arrived and Wynne stood on the corner with his arms up. (Ex. H, Page 15). They took his gun, patted him down and counted his bullets. (Exhibit H. Page 15). The police took witness statements and then hosed off the sidewalk. (Exhibit H, Page 15). At this point the crowd was dispersed and the foursome started to walk back to Kalisha and Audra's house.

Claire also confirmed the altercation between Palermo and Wynne after the Plaintiffs returned from the vet. Palermo began yelling at Wynne, accusing him of killing the dog unjustly. (Exhibit H, Page 16). Claire testified "they looked like were going to fight." (Exhibit H, Page 16). Everyone was nervous in the chaos. "We were yelling for the police to come back." (Exhibit H, Page 16). Wynne was trying to keep his distance from Palermo; he had his arms up trying to keep Palermo an arm's length away. (Exhibit H, Page 16). Finally, the police were able to separate the two men, and put Palermo in the back of a squad car so the foursome could leave. (Exhibit H, Page 18).

Claire also had some lasting effects from the attack. "I walk frequently. I'm nervous around dogs now...a year ago I would have taken Vinnie or anybody's dog that I was comfortable with....and now...any dog on a fence makes me a little nervous." (Exhibit H, Page 19-20).

*Testimony of Witness Christina Morgan*

Christina Morgan lives in the same neighborhood in Oak Park as the Plaintiffs. (Exhibit I, Deposition of Christina Morgan, Page 6).[7]  She was not a witness to the dog attack on August 2, 2020; however, she when she heard about it she came forward and voluntarily made a statement to the police about a prior attack by Astro. (emphasis added). (Exhibit I, Page 9).  Christina stated that in 2019 she was walking her dog, Patsy, on Norwood street next to the Palermo house, when her dog stopped to defecate. Palermo's dog, Astro, broke out from the backyard and went straight for Patsy's neck.(Exhibit I, Page 14).  Christina started screaming for the dog to let Patsy go, and tried to pull Patsy away using her leash. (Exhibit I, Page 15).  Joseph Palermo came out to assist her and pulled Astro off of Patsy. (Exhibit I, Page 15)[8]. Astro continued to struggle to try to get Patsy, but Christina was finally able to pull her dog away and ran away from Astro and Joe. (Exhibit I, Page 16). After the attack, Christina confirmed that Astro had punctured the skin, and Patsy was bleeding profusely from the neck. (Exhibit I, Page 16). Christina cleaned her up and decided not to take her to the vet. (Exhibit I, Page 16).  After the attack, Christina and Patsy didn't walk past the Palermo house anymore. She is also switched from a retractable leash to a regular leash. (Exhibit I, Page 16).  When asked why Christina had come forward, she said that there had been a lot of talk around the neighborhood, particularly on a Facebook, in support of Palermo. (Exhibit I, Page 17). Christina testified "I wanted it to be know that there was another side of the story, that it wasn't the first time that their dog had attacked another dog." (Exhibit I, Page 18).

---

[7]      Deposition of Christina Morgan taken on August 3, 2021 will be referenced to as Exhibit I with corresponding page number following "Exhibit I".

[8]      The man that helped Christina pull Astro off of Patsy was actually witness Brian Miller.  Because Christina did not know Joseph Palermo she mistakenly assumed Brian Miller was Joe Palermo. (See Exhibit J, Page 12).

*Testimony of Witness Brian Miller*

Brian Miller was a witness to the events on August 2, 2020. (Exhibit J, Deposition of Brian Miller, Page 8)[9]. Brian owns his own landscaping company and was across the street working that day. (Exhibit J, Page 6-7). He confirmed that he saw Astro run out of the backyard and then he heard the shots fired. (Exhibit J, Page 9). He didn't actually see the attack because there was a trailer parked in the street which obstructed his view. (Exhibit J, Page 9).

Brian also testified that he was the one that was actually assisted Christina Morgan when her dog was attacked. Brian testified that he had walked into the Palermo backyard to get a piece of equipment. (Exhibit J, Page 12). He saw Astro in the yard. At this point the dog was calm and not behaving in a threatening manner. (Exhibit J, Page 12). But when Miller opened the door and Astro saw Patsy, Miller knew that Astro was "going to attack." (Exhibit J, Page 13). Astro headed right for Patsy. (Exhibit J, page 12-13). He said he "jumped right on Astro and just opened his mouth and [Christina Morgan] freaked out and took her dog and they just ran off." (Exhibit J, page 12).

*Testimony of Officer Stanson*

Officer Stanson was called to the scene after the incident and took the witness statements. He witnessed Palermo confronting Rodney Wynne. "We had to restrain Mr. Palermo from attacking –confronting Rodney Wynne. We did end up handcuffing him and putting him into the back of the patrol vehicle because he was pretty much out of

---

[9]      Deposition of Brian Miller taken on August 3, 2021  will be referenced to as Exhibit J with  corresponding page number following "Exhibit J".

control." (Exhibit K, Deposition of Officer Stanson, Page 8: 11-14)[10]. Officer Stanson also testified in his experience as a police officer that <u>if a dog bites another dog, it is a dangerous dog.</u> (Exhibit K, Page 9). Furthermore, he testified that if a person has a dangerous dog it is the owners responsibility to keep that dog in their yard. (Exhibit K, Page 9).

*Testimony of Officer Cox*

Officer Cox was dispatched to the scene and spoke to the witnesses there. He did not talk to Wynne, and Parkes and Palermo had already left to take Astro to the vet. However, Officer Cox did witness the altercation between Palermo and Wynn after he returned from the vet. Cox testified that as Wynne was walking home, Palermo stopped his car in the middle of the road and started, "yelling and screaming and charging at the Defendant, Mr. Wynne." (Exhibit. L, Deposition of Officer Cox Page 8).[11] Mr. Wynne was repeatedly yelling at Palermo to stop and get away from him. (Exhibit. L, ,Page 8). Mr. Wynne tried to walk away from Palermo, but Palermo continued to pursue him. (Exhibit L, Page 8). Officer Cox had to separate Wynn and Palermo and then had to handcuff Palermo and place him in the back of the patrol call. (Exhibit L, Page 9).

*Testimony of Officer Troy Taylor*

Officer Taylor, along with his team, was in charge of deciding whether to charge Officer Wynne criminally for shooting the dog. He acknowledged that there was a lot of pressure from social media condemning Wynne's actions. (Exhibit M, Deposition of

---

[10]   Deposition of Officer Stanson taken on August 12, 2021 will be referenced to as Exhibit K with corresponding page number following "Exhibit K".

[11]   Deposition of Officer Cox taken on August 2, 2021 will be referenced to as Exhibit L with corresponding page number following "Exhibit L"

Officer Taylor, Page 17).[12] However, when looking at the totality of the circumstances including that the dog pinned down another dog, and tried to bite Deputy Wynne, they found that there was "some culpability on the dog owners as well." (Exhibit M, Page 17-18). He went to on to explain his reasoning, " you have the deputy saying that I was attacked, my friend's dog was attacked, I was trying to save not only my friend's dog, but also trying not to get injured...I am legally armed and I'm going to be honest with you, this something we're allowed to do within the law is protect ourselves or others when these things happen." (Exhibit M, Page 18). Ultimately, Wynne was not criminally charged in this matter, nor was Palermo charged with harboring a vicious animal. (Exhibit M, Page 18, 27).

Officer Taylor echoed Officer Stanson's assessment of an owner's responsibility when they have a dangerous dog is to "secure the animal, whether it be inside of the house or fence area in the yard or at least on a leash." (Exhibit M, Page 16).

<u>STANDARD OF REVIEW</u>

In order to survive a Fed. R. Civ. P. 12(b)(6) motion to dismiss the plaintiffs must show that the complaint is factually sufficient, and they have an obligation to provide the grounds that entitle them to relief. <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (1964). This requires more than labels and legal conclusions. <u>Id.</u> The Court must construe the complaint in the light most favorable to the nonmoving party, accept the nonmoving party's factual allegations as true. <u>Guzowski v. Hartman</u>, 969 F.2d 211, 213 (6th Cir. 1992). If the plaintiffs are unable to prove any set of facts to support their claim for relief,

---

[12]  Deposition of Officer Taylor taken on August 2, 2021 will be referenced to as Exhibit M with corresponding page number following "Exhibit M"

the Court will dismiss the case. Id. (quoting Conley v. Gibson, 355 U.S. 41, 45-6 (1957)).

Courts are not bound to accept as true a legal conclusion couched as a factual allegation.

Twombly, 550 U.S. at 555 (internal citations omitted).

Under Fed. R. Civ. P. 56, "summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law". Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (*internal citations omitted*). The United States Supreme Court has held that if a party fails to make a sufficient showing as to an essential element of her claim that party still bears the burden of proof at trial. Id. This entitles the moving party to a judgement as a matter of law because there is no genuine issue as to any material fact; the nonmoving party has failed to show an essential element of her claim, and bears the burden of proof to show all elements of that claim. Id. at 323.

## LAW AND ARGUMENT

**I.  Officer Wynne was not acting as a police officer under color of law at the time he shot the dog.**

"Section § 1983 is generally not implicated unless a state actor's conduct occurs in the course of performing an actual or apparent duty of his office, or unless the conduct is such that the actor could not have behaved as he did without the authority of his office." See West v. Atkins, 487 U.S. 42, 49-50, (1988). "Waters v. City of Morristown, 242 F.3d 353, 359,(6th Cir., 2001). "The key determinant is whether the actor intends to act in an official capacity or to exercise official responsibilities pursuant to state law." *Id.*

"According to this Court, it is held that a police officer acts under color of state law when

he purports to exercise his official authority." <u>Waters</u> at 359. "Such manifestations of an official authority include flashing of badge, identifying oneself as a Police Officer and placing the individual under arrest or intervening in a dispute between third parties pursuant to a duty impose by Police Department Regulations." <u>Smith v. Kennemore</u>, 2019 U.S. Dist. LEXIS 214334, *13, 2019 WL 6792754 citing <u>Memphis, Tenn. Area Local, Am. Postal Workers Union v. City of Memphis</u>, 361 F.3d 898, 903, 86 Fed. Appx. 137 (6th Cir. 2004).

The facts in <u>Smith</u>, involved two neighbors. Defendant however, was a police officer. Defendant's dog got loose and wandered in Plaintiff's yard. Defendant's wife went into Plaintiff's yard to retrieve the dog. Plaintiff threatened to shoot the dog. Several hours later, Defendant drove to the neighbor's house, knocked on the door. When Plaintiff answered, Defendant asked if Plaintiff had threatened his dog and his wife. Plaintiff admitted threatening to shoot the dog, but denied threatening to shoot the wife. Defendant became very angry and shouted at Plaintiff, at one point poking Plaintiff in the chest with his finger. Plaintiff retaliated by hitting Defendant on the hand with a large walking stick. A friend, who was in the house at the time called 911. Plaintiff eventually filed suit against Defendant alleging, among other counts, two violation of 42 USC § 1983, for unlawful entry and seizure without probable cause and malicious prosecution.

Defendant argued that federal action should be dismissed because Defendant was not acting under color of state law at that time. The court agreed. The court weighed many factors including that Defendant was not on duty at the time of the incident, he was not wearing a uniform or driving a marked police car, he did not identify himself as police officer or show his badge. The Plaintiff did not cite any evidence that he was acting pursuant to any official duty, and furthermore, the dispute arose from personal

circumstances and not from interactions between Plaintiff and Defendant in performance of official duties.

In this case, Officer Wynne was not performing any actual or apparent duty of his office. His intent was not to act as a police officer. He was simply trying to go get ice cream with his girlfriend when Plaintiff's dog, unleashed and unattended, attacked his dog on the sidewalk. He was not on duty. He was not wearing his police uniform or driving a patrol car.  He was not executing a search warrant. He did not use his service weapon.  He was not with any other law enforcement officer.  He was not attending to any police business on this particular day. He did not use any special authority afforded him as a police officer.

Furthermore, the interaction between Astro and Wynne was personal in nature, just like the Smith case.  Wynne was forced to react to an imminent danger of an attacking dog. Wynne did not have any prior history of interaction with either the Plaintiffs or their dog . (See Layne v Sampley, 627 F.2d 12, 12-13 (6th Cir. 1980) There is no state action that caused Wynn to interact with Astro, such assisting another officer called to the home (See Altman v. City of High Point, 330 F.3d 194, (4th Cir. 2003)), executing a warrant (See Brown v. Battle Creek Police Dep't, 844 F.3d 556, (6th Cir. 2016), or intervening in an attack between Astro and a third party pursuant to police duties (See Stengel v. Belcher, 522 F.2d 438, 440-41 (6th Cir. 1975)).

As the women with Wynne all testified, it was a terrifying experience. Claire even said she "knew the dog was going to kill [her dog] Vinnie."  The nature of Wynne's act was self defense and defense of the women and dogs he was with. Wynne's intent was to protect everyone involved, not as a police officer, but as a friend.

Plaintiffs have argued that Wynne was acting under color of law and will likely

14

reference that the fact that Wynne identifies himself as police officer and shows his badge after the shooting . However, he does this only as a way to identify himself . He is not trying to exert any authority at this point because the dog had already been shot. He then called the police just as any other citizen would after a violent interaction with a threatening animal.

Plaintiffs will also likely note that Wynne does not have a CPL license, but is able to carry a gun as a Genesee County Sheriff's Officer.  However,  Wynne testified that he carries his gun with him everyday for protection. (Ex. A, Page 18). This is a standard justification for carrying a gun that might be offered by any private citizen exercising their 2nd Amendment rights. Also, the gun he was carrying as a citizen is not the same one he uses in his capacity as a police officer. (Ex. A, Page 21).  Therefore, it stands to reason, that even if Wynne is carrying a gun he is not always acting under the authority of the state.

Furthermore, it is interesting to note after the incident, when Palermo returned to the scene and began yelling and acting menacingly toward Wynne, that Wynne did not attempt to arrest or constrain him. Wynne instead looked to the other officers to contain the situation. If he had been acting under color of law, Wynne surely would have asserted his authority over Palermo to ensure his own safety. Taken together, all of these facts show that Wynne was not acting under color of law, but as a private citizen.

**II.  Alternatively, if the court determines that Wynne acted under color of law the force used was reasonable given the imminent danger posed by the dog, and therefore, no taking occurred.**

"A police officer's use of deadly force against a dog ....is reasonable under the Fourth Amendment when, given the totality of the circumstances and viewed from the

perspective of an objectively reasonable officer, the dog poses an imminent threat to the officer's safety." <u>Brown v. Battle Creek Police Dep't</u>, 844 F.3d 556, 568, (6th Cir. 2016). Under the basic reasonableness calculus, a court must "balance the nature and quality of the intrusion on the individual's Fourth Amendment interest against the importance of the governmental interests alleged to justify the intrusion." " <u>United States v. Place</u>, 462 U.S. 696, 703 (1983) "The reasonableness calculus is objective in nature, and does not turn on the subjective intent of the officer." <u>Graham v Connor</u>, 490 U.S. 386, 297 (1989). The court in Graham went on to say reasonableness must allow for the fact that officers are forced to make split second judgments, in tense and rapidly evolving circumstances about the force that is necessary in a particular situation. *Id.* at 396-397. Plaintiffs bear the burden of proving that the seizure was unreasonable. <u>West v. Atkins</u>, 487 U.S. 42, 48 (1988).

In <u>Altman v City of High Point, N.C.</u>, 330 F.3d 194, (4th Cir. 2003), a case cited by Plaintiffs in their Complaint, the court notes four separate instances in which dogs have escaped from their owners residences and are roaming free without a leash. Each time, an officer shot the dog in question and the court found that he acted reasonably <u>every single time</u>. *Id.* at 206-207 In one instance, an officer shot a dog in the owner's driveway while after the dog turned away from the officer and headed toward the street. *Id.* at 197. Another cited a dog who had broken out of a yard and was following a meter reader around. *Id.* at 199. A concerned citizen, knowing the dog had aggressive tendencies called 911. *Id.* When the police arrived the dog began running away and the officer shot the dog. *Id.* The court found the action was reasonable given that the dog was part pit bull, a dangerous breed of dog and that the dog's actions were "sufficiently aggressive" to justify the shooting, despite the fact that the dog had not actually attacked a person. *Id.* at 206.

In <u>Altman</u>, the court weighed the interests of both the public and dog owners. The

16

court acknowledged the significant emotional bond between a person and dog. *Id. at* 205.

However, the court also noted that dogs can be dangerous; they can maim, harass or even

kill humans, livestock or other pets. *Id.*. Dogs can spread disease and cause property

damage. *Id.* . The court also acknowledged when a dog is roaming free on the street and

not leashed or properly secured that public safety may be a greater concern than the

owners property interest. *Id.*

"When a dog leaves the control of his owner and runs at large in a public space, the government interest in controlling the animal and preventing the evils mentioned above waxes dramatically, while the private interest correspondingly wanes. Put simply, while we do not denigrate the possessory interest a dog owner has in his pet, we do conclude that dog owners forfeit many of these possessory interests when they allow their dogs to run at large, unleashed, uncontrolled, and unsupervised, for at that point the dog ceases to become simply a personal effect and takes on the **nature of a public nuisance.**" <u>Altman</u> at 205-206.

The case that is directly on point, is the 6th Circuit case of <u>Brown v Battle Creek</u>,

844 F.3d 556 (2016). In <u>Brown</u>, an officer shot and killed two dogs while conducting a

search for drugs at a Defendant's home. The officer described the dogs as a large brown

pitbull and a small pitbull around 53 pounds. He said that when they entered the

residence, the first dog jumped off the couch and was aggressively barking at the officers

and lunged at them. The second pit bull jumped off the couch, went in the kitchen and

into the basement. When the first pit bull lunged at him in the entry way the officer fired

his first shot. He hit the dog with a non lethal shot but he was aiming at his head. After he

struck the first pit bull, the dog moved away from the officers, towards the kitchen and

down the stairs into the basement. The first pit bull, according to the officer, was

obstructing the path way to the basement.

As they went half way down the stairs the first dog was at the bottom of the stair

case, turned towards them and started barking, at that point the officer fired two fatal

rounds at the first pit bull. After he shot and killed the first dog he noticed the second dog

17

was standing about one-half way across the basement. The second dog was not moving towards the officers but was just standing there barking. The officer fired the first two rounds at the second dog. The second pit bull was shot by another officer. They saw blood and did not want the dog to suffer so they fired again.

While Plaintiffs cite to this case because the court finds that a dog is property and the unreasonable seizure of property is a violation of the Fourth Amendment, the court also finds the officers acted reasonably in shooting and killing Plaintiff's dogs. Brown at 566, 572. The court took into account the officers testimony that the dogs lunged at the officers, they were barking aggressively, the size and nature of the dogs, and the fact they were unleashed when deciding the objective reasonableness of the officers' actions.

In this case, the dog in question was a large dog, similar to a pitbull in appearance, acting aggressively toward a small puppy, biting and shaking it violently. Officer Wynne testified that the dog mouthed his arm as well. The women walking with Officer Wynne testified that they were terrified and Audra Sanders even grabbed Claire Turkington pulling her to the ground. Kalisha Hubler described this as one of the most terrifying experiences in her life. (Exhibit F, 28). The dog was unleashed and the owners were no where in sight.

When analyzing the totality of the circumstances, it is clear that Wynne perceived an imminent danger and his reaction was objectively reasonable. Any reasonable person would have felt threatened in the same circumstances. The facts in this case present a far more dangerous dog than any of the examples in Altman, and similar to the facts in Brown where those courts found the use of deadly force against a dog to be reasonable. Furthermore, Wynne was forced to assess the situation in a split second and react accordingly. Given all of these facts, it is objectively reasonable for Defendant to

determine that Astro posed an imminent threat and to use deadly force.

**III. The use of force was not wrongfully exerted, therefore there is no conversion.**

"Pets have long been considered personal property in Michigan Jurisprudence. See Ten Hopen v Walker, 96 Mich. 236, 239; 55 N.W. 657 (1893)." Koester v VCA Animal Hospital, 244 Mich. App. 173, 176, (2000). "Conversion is any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein." Thoma v. Tracy Motor Sales, Inc., 360 Mich. 434, 438, 104 N.W.2d 360 (1960). Liability does not arise, however, "if the actor is privileged to dispose of the chattel." Id. In this case, if the court finds that the shooting of Astro is reasonable under the Federal law standard, then there can be no conversion claim because dominion over the chattel (Astro) was not wrongfully exerted. Furthermore, Erin Parkes admits that Astro was unlicensed. (Exhibit D, Page 37). Per the ruling in Preston v. City of St. Clair Shores, 2015 U.S. Dist. LEXIS 182423, 2015 WL 12516687, an officer is privileged to dispose of a dog in accordance with their duty to enforce the State laws and City ordinances regarding pet licensing. See M.C.L. §§ 287.266, 287.268. Preston at 25-26.

In the alternative, if the court finds conversion in this matter the Plaintiffs should be limited in their recovery to the value of the dog. This is a long held, common law principle in Michigan. "The proper measure of damages in this case is the difference in the market value of the [animal] after it was injured from its pre-injury market value." Guzowski v. Detroit Racing Asso., 130 Mich. App. 322, 328, 343 N.W.2d 536, 540, (1983) quoting Davidson v. Michigan C. R. Co., 49 Mich. 428, 431; 13 N.W. 804, (1882). Furthermore, "the Court may decline to exercise supplemental jurisdiction over remaining state law claims once it has dismissed all claims over which it possessed original jurisdiction. Saglioccolo v. Eagle Ins. Co., 112 F.3d 226, 233 (6th Cir.1997). Indeed, the

19

Sixth Circuit has recognized that if all federal claims are dismissed before trial, remaining state law claims should generally be dismissed as well. *Id*." Hardrick v. City of Detroit, 2016 U.S. Dist. LEXIS 154642, *42, 2016 WL 6600039.

**IV. Plaintiffs cannot recover for Intentional Infliction of Emotional Distress as a consequence of property damage under Michigan law.**

Similarly to Plaintiffs' conversion claim, Plaintiffs ability to recover depends on their ability to establish a violation of § 1983, or a wrongful taking under the Fourth Amendment. Although the courts have acknowledged the emotional attachment to the family dog, pets are still "considered personal property in Michigan jurisprudence,' and '[t]here is no Michigan precedent that permits the recovery of damages for emotional injuries allegedly suffered as a consequence of property damage.'" Preston at 10-11 (quoting Koester v. VCA Animal Hosp., 244 Mich. App. 173, 624 N.W.2d 209, 211 (Mich. Ct. App. 2000)). Accordingly the Court in Preston grants summary judgment to the Defendants on the Plaintiffs' Intention Infliction of Emotional Distress claim.

The Plaintiffs are only able to collect additional damages under Federal law if the court finds a violation of the Fourth Amendment. See Moreno v. Hughes, 157 F. Supp. 3d 687, 2016 U.S. Dist. LEXIS 5697 ( E.D. Mich. January 19, 2016). However, as previously outlined, in this instance there is no Fourth Amendment taking because the Wynne did not act under the color of law at the time he shot the dog, and furthermore, the shooting was reasonable when balancing the public good against the Plaintiffs Fourth Amendment interests. Therefore, federal law no longer applies and under current Michigan law property damages should be limited to the value of the dog.

**V. Plaintiffs cannot recover Intentional Infliction of Emotion Distress because they are unable to establish that Defendant engaged in extreme or outrageous conduct.**

20

In order to recover for Intentional Infliction of Emotional Distress, Plaintiffs must prove the following elements: (1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress." Hayley v Allstate Ins Co, 262 Mich App 571, 577; 686 NW2d 273 (2004) .

"It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice, or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." " Atkinson v Farley, 171 Mich App 784, 789; 431 NW2d 95 (1988).

The court in Atkinson noted that this test is a demanding one and that the necessary threshold for establishing conduct that is extreme and outrageous is "formidable" Atkinson at 789. "The test to determine whether a person's conduct was extreme and outrageous is whether recitation of the facts of the case to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' " Lewis v LeGrow, 258 Mich App 175, 196; 670 NW2d 675 (2003).

In prior section of this motion, we discussed the reasonableness of Wynne's actions in shooting the dog. In Altman v City of High Point the court looked at several different scenarios in which apparently dangerous dogs were shot in the street. The court found that the officer in question acted reasonably every single time. The court in Brown v Battle Creek also found that the officers acted reasonably when they shot Plaintiffs dogs given the imminent danger posed by those animals. These examples show it is not plausible that the action taken by Wynne is "utterly intolerable in a civilized community" and "beyond all possible bounds of decency" of when we have clear examples of the same behavior being tolerated and excused. It is understandable and reasonable that a person being attacked by a dog may defend themselves, and that if they are armed, they may

21

shoot that dog.

**VI. Plaintiffs are unable to establish that they suffered severe emotional distress.**

The fourth element that must be established in order to recover for Intentional Infliction of Emotional Distress is severe emotional distress. The Michigan Supreme Court defined severe emotional distress in <u>Roberts v Auto-Owners Ins Co</u>, 422 Mich 594, 602; 374 NW2d 905 (1985), quoting the commentary from the Second Restatement stating:

> "Emotional distress passes under various names, such as mental suffering, mental anguish, mental or nervous shock, or the like. It includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea. It is only where it is extreme that the liability arises...The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it."

Plaintiff Joe Palermo refused to testify at his deposition about how the shooting of the dog effected him. He was combative and evasive, and refused to offer any testimony in regard to his mental state. He testified that he had not sought any additional treatment for emotion distress after the August 2nd incident, but was maintaining his "normal maintenance with his normal practitioner." (Exhibit E, page 11). Mr. Palermo refused to discuss what medication he was taking, but admitted to being treated for preexisting condition of bipolar disorder and depression. (Exhibit E, page 11, 12). Mr. Palermo's medication did not change after the incident. (Exhibit E, page 14). When asked if either his depression or bipoloar disorder was exacerbated by the incident, he again refused to discuss it saying "I wouldn't know that. I'm not a doctor." (Exhibit E, Page 14). He was insistent that he was not qualified to comment on his own mental health, despite claiming it was adversely effected by the incident in the pleadings. He could not list any change in symptoms stating "I'm not a doctor. I don't diagnose symptoms." (Exhibit E, Page 17). He even admitted <u>he didn't even discuss the incident with his doctor</u>. (Exhibit E, Page 19).

Finally, when asked about the symptoms by his own attorney, he described his

22

symptoms as rage, sorrow and distress. He also noted his blood pressure went up. (Exhibit D, Page 53). Again, when asked for physical symptoms caused by the incident, Mr. Palermo refused to Answer, indicating he thought the question was "asinine" and Mr. Olsen contented that the question had been asked and answered even though Mr. Palermo consistently refused to answer it. (Exhibit E, Page 53-54).

As to Erin Parkes, she admits to having a preexisting condition of anxiety and depression; she currently takes medication for both conditions. Erin testified she has been treating these issues on and off for the last 20 years. (Exhibit D, Page 32). When asked if she had received any treatment for physical or psychological ailment as a result of the incident, Erin denied receiving treatment. (Exhibit D, Page 30). She did indicate a slight increase in her medication and stated she believed the incident likely exacerbated her current symptoms. (Exhibit D, Page 33). Plaintiff's inability to describe their symptoms and lack of medical treatment preclude Plaintiffs from making a viable claim for Intentional Infliction of Emotional Distress.

<u>CONCLUSION</u>

Based on the case law and facts stated above, the Defendants respectfully request that this Honorable Court GRANT their Motion for Dismissal pursuant to Fed. R. Civ. P. 12(b)(6) and Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56.

Respectfully Submitted,

RAFTERY & BARRON, P.C.

/s/ Jeanne V. Barron
JEANNE V. BARRON (P37138)
Co-Counsel for **Defendants**
32901 Middlebelt Road, Suite 500
Farmington Hills, MI 48334
(248) 538-2400

Dated: September 16, 2021.

23

## PROOF OF SERVICE

The undersigned certifies that the foregoing instrument was served upon all parties to the above cause to each of the attorneys of record herein at their respective addresses disclosed on the pleadings on

September 16, 2021         by:

                    ____U.S. Mail            ____Fax
                    ____Hand Delivered       ____UPS
                    ____Federal Express       x  Other/efile


                         Signature   /s/ Amy Slingerland
                                      Amy Slingerland