UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ERIN PARKES and JOSEPH JOHN PALERMO,

    Plaintiffs,

                                    Case No. 20-12650

v.                                      Judge Denise Page Hood

RODNEY ROBERT WYNNE,

    Defendant.

_____/

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 18)**

**I.    BACKGROUND**

    **A.    Procedural Background**

Plaintiffs Erin Parkes ("Parkes") and Joseph John Palermo ("Palermo") filed suit on September 29, 2020, alleging violations of 42 U.S.C. § 1983 (Count I) relating to the shooting of their dog by off-duty Genessee County Sheriff's Deputy Rodney Robert Wynne ("Wynne"). Plaintiffs also bring state law claims under Michigan law of Conversion (Count II) and Intentional Infliction of Emotional Distress (Count III).

This matter is before the Court on Wynne's Motion for Summary Judgment (ECF No. 18). Wynne asks for dismissal of all claims against him pursuant to Fed. R.

Civ. P. 12(b)(6) and Fed. R. Civ. P. 56.

### B. Factual Background

Plaintiffs make the following allegations relating to the events of August 2, 2020.

Unbeknownst to Plaintiffs, their family dog ("Astro") escaped the backyard of their property in Oak Park, Michigan during the afternoon of August 2, 2020. (ECF No. 1, PageID.4, ¶ 19) At the same time, Wynne was walking nearby with three companions and two dogs, one of which was a pit bull puppy ("Vinnie"). (*Id.*, PageID.3, ¶ 11)

As Astro encountered Wynne's group, Wynne shot Astro once in the lower spine and a second time in the chest, resulting in Astro's death. (*Id.*, ¶¶ 10-13) Although Astro laid on his back after being shot once, Wynne shot Astro a second time. (*Id.*, ¶ 13) During the time between the first and second shot, Wynne made eye contact with Parkes who, alerted by the first shot, was screaming through her home's window at Wynne. (*Id.*, ¶ 14). During the same interval, Palermo was running toward Astro. *Id.* Immediately after shooting Astro, Wynne identified himself to "Plaintiffs, by-standers and to the Oak Park police as a police officer" and displayed his Genesee County Sheriff deputy employee identification the car to the Oak Park police officers

on the scene. (*Id.*, PageID.4, ¶¶ 22-23) Parke and Palermo then rushed Astro to the veterinarian, during that time, Oak Park police officers returned Wynne's firearm and advised him to contact his supervisor. (*Id.*, PageID.3, ¶¶ 1618)

The Complaint disputes several portions of Wynne's account of the shooting made to the Oak Park police. (*Id.*, PageID.5, ¶¶ 28-36) Wynne reported to the police that Astro was a Pitbull; that Astro attacked Vinnie's neck; that Wynne twice attempted to remove Astro from Vinnie's neck; that Astro latched on to Wynne's arm; that after Wynne disengaged Astro, Astro once again latched onto Vinnie's neck; and that Astro did not release his grip from Vinnie's neck until Wynne had shot Astro twice. (*Id.*, ¶ ¶ 26-27) The Complaint alleges that contrary to Wynne's account, Astro was not a Pitbull; that an examination of Vinnie revealed no bite marks; that Wynne did not request or receive medical attention and did not show bite marks; that Wynne shot Astro while one of his companions was running away with Vinnie in her arms; and that Astro did not present a risk of imminent harm to either Vinnie nor Wynne. (*Id.*, PageID.6, ¶¶ 28-33, 36) Plaintiffs allege that Wynne "intervened as a police officer and exercised excessive force." (*Id.*, ¶ 34). They state that "[o]n information and belief," Wynne "had no training with respect to dog encounters." (*Id.*, PageID.7, ¶ 37)

## II. STANDARD OF REVIEW

3

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the plaintiff's complaint. Accepting all factual allegations as true, the court will review the complaint in the light most favorable to the plaintiff. *Eidson v. Tennessee Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007). To survive a motion to dismiss, the complaint must state sufficient "facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The complaint must demonstrate more than a sheer possibility that the defendant's conduct was unlawful. *Id.* at 556. Claims comprised of "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Rule 56(a) of the Rules of Civil Procedures provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. 56(a). The presence of factual disputes will preclude granting of summary judgment only if the disputes are genuine and concern material facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Id*. Although the Court must view the motion in the light most favorable to the nonmoving party, where "the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Celotex Corp.*, 477 U.S. at 322-23. A court must look to the substantive law to identify which facts are material. *Anderson*, 477 U.S. at 248.

### III. DISCUSSION

Defendant Wynne makes four arguments in favor of dismissal, contending first that he was not acting under color of state law at the time he shot the dog. Second, he argues that the use of force was reasonable, given the imminent danger posed by the dog. For the same reasons, he argues third that the conversion claims should be dismissed because his use of force was not wrongfully exerted. Last, he contends

that Plaintiffs cannot show that his conduct was extreme or outrageous as required to establish their claim of Intention Infliction of Emotional Distress ("IIED").

### A. Color of State Law

Wynne argues first that he was "not performing any actual or apparent duty" in his capacity as a Sherriff's Deputy at the time he shot Astro. (ECF No. 18, PageID.98)(*citing Waters v. City of Morristown,* 242 F.3d 353, 359 (6th Cir., 2001)). He notes that at the time of the shooting, he was off duty and was not carrying his service weapon. In response, Plaintiffs argue that while Wynne used his own gun to shoot Astro, he was permitted to carry a gun without a concealed weapon permit in his capacity as an off-duty Sheriff's Deputy. *Wynne's Deposition* (ECF No. 18 -1, PageID.169-170, 173). Plaintiffs argue that Wynne's use of the weapon was permitted only because of his status as a Sheriff 's Deputy. Plaintiffs cite *Stengel v. Belcher*, 522 F.2d 438, 441 (6th Cir. 1975), in support of their argument that Wynne's off-duty status does not prevent the trier of fact from finding he was acting under color of state law at the time of the events in question.

Certain facts are not in dispute. Palermo testified that "the first thing out of [Wynne's] mouth" after shooting the dog was "I'm a cop." (ECF No 18-2, PageID.300). Wynne then called 911 and identified himself as a police officer. He reported that he handed his ID to the responding officer. (ECF No. 18-1,

6

PageID.169).  Wynne testified that he told the responding officer that he was legally "able to carry the weapon" in his capacity as an off-duty Sheriff's Deputy.  (*Id.*, PageID.169-170). In his reply brief, Wynne concedes that he "identifie[d] himself to both Plaintiff's (sic) and to police on the scene." (ECF No. 21, PageID.533). Parkes testified that moments after the shooting, Palermo had already been made aware that Wynne was a police officer. *Parkes Deposition* (ECF No. 18, PageID.251252). Parkes testified that as she arrived on the scene seconds after the first shot was fired, Palermo had already been informed that Wynne was a police officer.  (*Id.*, PageID.253).

      To prevail on a claim under § 1983, a claimant must show that "(1) that he or she was deprived of a right secured by the Constitution or laws of the United States; and (2) that the deprivation was caused by a person acting under color of law." *Robertson v. Lucas*, 753 F.3d 606, 614 (6th Cir. 2014).  "Acts of police officers in the ambit of their personal, private pursuits fall outside of 42 U.S.C. §1983." *Stengel v. Belcher*, 522 F.2d 438, 441 (6th Cir. 1975) .  However, "[t]he fact that a police officer is on or off duty, or in or out of uniform is not controlling. It is the nature of the act performed, not the clothing of the actor or even the status of being on duty, or off duty, which determines whether the officer has acted under color of law."    *Id.* (internal citations and punctuation omitted).

      Factors to be considered "when deciding whether an officer was acting under

color of state law" include "whether the officer flashed a badge, identified himself as a police officer, placed an individual under arrest, intervened in a dispute between third parties pursuant to a duty imposed by police-department regulations," *Morris v. City of Detroit, Michigan*, 789 F. App'x 516, 518 (6th Cir. October 16, 2019)(*citing Memphis, Tenn. Area Local Am. Postal Workers Union v. City of Memphis*, 361 F.3d 898, 903 (6th Cir. 2004)) "or used state-issued equipment." *Id.* (*citing Layne v. Sampley*, 627 F.2d 12, 13 (6th Cir. 1980)).

Whether a defendant acted under color of law is question of law to be determined by the court. *Neuens v. City of Columbus*, 303 F.3d 667, 670 (6th Cir. 2002). But "the distinction between private and state action is a 'necessarily fact bound inquiry' that is determined on a case-by-case basis." *Lindke v. Freed*, No. 20-10872, 2021 WL 4427170, at *4 (E.D. Mich. Sept. 27, 2021)(Goldsmith, J.)(*quoting Lugar v. Edmondson Oil Co., Inc.* 457 U.S. 922, 939 (1982)).

Plaintiffs rely on *Stengel*, in which the Court held that the off-duty defendant police officer acted under color of law when he intervened in a brawl by spraying police department issued mace and shooting the plaintiffs with a pistol he was required to carry while off duty. 522 F.2d at 441. The Court found that the Police Chief's statement that "a police officer was required to take action in any type of police or criminal activity 24 hours a day" and the fact that the defendant was

8

exonerated because the defendant's actions were performed "in line of duty under circumstances relating to police duties" supported the finding that the defendant acted under color of law during the off-duty encounter. *Id.* (internal citations omitted).

In contrast, the Court in *Morris, supra*, 789 F. App'x at 518, held that the defendant police officer was not acting under color of law at the time she discharged her gun during a dispute regarding a personal loan, although at the time she was on duty and "had her badge, handcuffs and service revolver with her." "The sole purpose for Adams being at Morris' house was to collect a personal debt of $300. Adams did not purport to be conducting police-related business, nor did she attempt to use her status as a police officer advantageously during the altercation." *Id.; see also Waters v. City of Morristown, TN*, 242 F.3d 353, 359 (6th Cir. 2001)("Because of the close personal relationship between Waters and [the defendant] and [the defendant's] status as her employer, he would have been in the same position to harass and abuse Waters even if he had not been a city alderman."

Parties do not dispute that Wynne was off duty and engaged in solely personal activity just prior to the events in question. "[A] defendant's private conduct, outside the course or scope of his duties and unaided by any indicia of actual or ostensible state authority, is not conduct occurring under color of state law." *Waters,* 242 F.3d. at 359. But as in *Stengel*, Wynne's authority to carry the gun used to shoot Astro was

premised on his status as a sheriff's deputy. There are other indications that once Wynne shot Astro, he sought to use his status as a law enforcement officer "advantageously" to justify his actions. Parkes testified that moments after the second shot was fired, Wynne had already identified himself to others as a law enforcement officer. Although Wynne testified that he informed the Oak Park Police Department via 911 that he was a law enforcement officer for the purpose of establishing his authority to carry a gun, it is unclear whether he also announced his status to lend the "indicia of authority" to his actions as bystanders began to gather following Astro's shooting. *See Morris, supra,* 789 Fed. App'x at 519.

At this pretrial stage of the proceedings, the Court finds there are genuine issues of material fact as to whether Wynne acted under color of law considering his statements to the police officer. The Court cannot find as a matter of law that Wynne did not act under color of law during the events in question.

### B. The Reasonable Use of Force

Wynne also contends that even if a question of fact exists as to whether he was acting under color of state law, his actions were not unreasonable given the "'totality of circumstances and viewed from the perspective of an objectively reasonable officer . . .'" (ECF No. 18,PageID.99-100)(*citing Brown v. Battle Creek Police Dep't,* 844 F.3d 556, 568 (6th Cir. 2016)). In response, Plaintiffs dispute that the shooting was

reasonable, arguing that there was no justification for Wynne's second shot of Astro. Plaintiffs cite *Viilo v. Eyre,* 547 F.3d 707, 708 (7th Cir. 2008), in which the Court held that a question of fact existed as to whether the third and fourth shots fired at a dog that was already incapacitated were unreasonable. (ECF No. 20, PageID.431-432).

In line with every other circuit that has addressed this issue, the Sixth Circuit has held that "a dog is property, and the unreasonable seizure of that property is a violation of the Fourth Amendment." *Brown*, 844 F.3d at 566.

A number of this Court's sister circuits have already concluded that, "'the use of deadly force against a household pet is reasonable only if the pet poses an [imminent] danger and the use of force is unavoidable.'" *Robinson v. Pezzat* , 818 F.3d 1, 7 (D.C. Cir. 2016) (quoting *Viilo v. Eyre*, 547 F.3d 707, 710 (7th Cir. 2008) (holding that the unreasonable killing of a companion dog constitutes a seizure under the Fourth Amendment)). *See also Mayfield v. Bethards*, 826 F.3d 1252, 1256 (10th Cir. 2016) (holding that killing a dog constitutes a violation of the dog owner's Fourth Amendment rights absent a warrant or some exception to the warrant requirement); *Carroll v. Cty. of Monroe*, 712 F.3d 649, 651 (2d Cir. 2013) (holding that the unreasonable killing of a companion animal constitutes an unconstitutional seizure of personal property under the Fourth Amendment); *Hells Angels*, 402 F.3d at 975–78 (holding that the killing of guard dogs was unreasonable under the Fourth Amendment

11

where "the officers were not presented with exigent circumstances that necessitated killing the dogs"); *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 211 (3d Cir. 2001) (same); *cf. Altman v. City of High Point*, 330 F.3d 194, 204–05 (4th Cir. 2003)(holding that privately owned dogs were effects subject to the protections of the Fourth Amendment but officers' actions of shooting and killing the dog were objectively reasonable). *Id.* at 566.

First, a question remains as to whether Wynne acted reasonably in firing the first shot. While Wynne and his companions claim that Astro had Vinnie by the neck, a later examination revealed that Vinnie did not have bite marks or other injuries. Wynne's companion Claire Turkington testified that Vinnie was not harmed during the encounter except that upon examination after Astro was shot, Vinnie "was covered in, like, slobber." (ECF No. 21, PageID.573); *see also Deposition of Audra Sanders* (Vinnie "had like slobber and drool on his neck, but no bites. No, he wasn't bleeding"). (*Id.*, PageID.579). Wynne reported that Astro "mouthed" his arm, yet again, Wynne did not report bruises or bite marks. *Id.*

Setting aside the dispute as whether the first shot constituted an unreasonable use of force, the Court clearly cannot conclude as a matter of law that after Astro was shot for the first time, he posed an imminent danger and that the use of force in firing the second shot was unavoidable. While Wynne completed a police report stating

12

that Astro did not release Vinnie until the second shot was fired, he later testified that after the first shot, Astro was moving "sideways" and had released his alleged grip on Vinnie's neck. Parkes testified that after the first shot hit Astro in the spine, he staggered before receiving the second, fatal shot to the chest. Palermo testified that after the first shot, Astro had "his rear haunches on the ground kind of spinning, obviously in distress" (ECF No. 21, PageID.552). At the time of the second shot, Palermo observed that Wynne's companions "had retreated" and one of them "had [Vinnie] up in her arms." (*Id*., PageID.553). While Wynne argues that the shots were in quick succession, Palermo was able to arrive at the scene between the time he heard the first shot and when Wynne raised his gun to shoot a second time. (*Id*., PageID.554). Wynne arguably had enough time between the first and second shots to perceive that Astro was no longer a threat to himself, his companions, or Vinnie.

In *Brown*, defendant officers shot two dogs during a drug raid where "it was necessary to shoot the dog[s] in order for them to safely sweep the residence and [e]nsure that there were no other gang members in the residence and that evidence was not being destroyed." *Brown,* at 570 ("A jury could reasonably conclude that a 97–pound pit bull, barking and lunging at the officers as they breached the entryway, posed a threat to the officers' safety"). The present case is distinguishable in several ways. Wynne was not conducting the search of an enclosed area. The events occurred

outside during daylight hours. After being shot for the first time, Astro was not charging or otherwise menacing other dogs or individuals. Because Wynne cannot show that he or others were in imminent danger and that the use of force was unavoidable after the first shot was fired, he is not entitled to judgment as a matter of law. There remain issues of fact as to whether the use of force by Wynne was reasonable under the circumstances.

### C. Conversion

Wynne argues that because Plaintiffs cannot show that the use of force against Astro was not "'wrongfully exerted'" the claim of conversion should be dismissed. (ECF No. 18, PageID.103)(*citing Thoma v. Tracy Motor Sales, Inc.,* 360 Mich. 434, 438, 104 N.W.2d 360 (1960)). Wynne contends that "[l]iability does not arise, however, 'if the actor is privileged to dispose of the chattel.'" (ECF No. 18, PageID.103)(*quoting Thoma* at 438). Wynne argues that "if the court finds that the shooting of Astro is reasonable under the Federal law standard, then there can be no conversion claim because dominion over the chattel (Astro) was not wrongfully exerted." Plaintiffs respond that the improper shooting of a dog "constitutes conversion under Michigan Law." (ECF No. 20, PageID.438)(*citing Richards v. City of Jackson,* No. 16-CV-13520, 2018 WL 9988772, at *7 (E.D. Mich. Aug. 27,

2018))(Parker, J.) *aff'd sub nom. Richards v. City of Jackson, Michigan*, 788 F. App'x 324, 2019 WL 4447390 (6th Cir. September 17, 2019).

"Under the common law, conversion is 'any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein.'" *Richards* at *7 (*quoting Foremost Ins. Co. v. Allstate Ins. Co.,* 439 Mich. 378, 486 N.W.2d 600, 606 (Mich. 1992) ). "'Conversion may occur when a party properly in possession of property uses it in an improper way, for an improper purpose, or by delivering it without authorization to a third party.'" *Id.* (*quoting Dep't of Agric. v. Appletree Mktg. LLC,* 485 Mich. 1, 779 N.W.2d 237, 244-45 (2010)).

In *Richards*, the court denied summary judgment on conversion claims to a defendant officer who shot plaintiff's dog during an allegedly unlawful entry. The defendant relied on Mich. Comp. Laws § 287.279, which allows "a law enforcement officer [to] kill any dog which he sees in the act of pursuing, worrying, or wounding any livestock or poultry or attacking persons" with "no liability on such person in damages or otherwise, for such killing." The Court found that the officer's initial claim that he was bitten by the dog was contradicted by his later testimony that the dog was only "biting at his feet," *Richards* at *2, and another officer's testimony that the dog was merely growling at the time it was shot. *Id.* at *7(question of whether the dog was "attacking" under § 287.279 "is for the factfinder").

Wynne concedes that the question of whether the shooting was "reasonable" under the Fourth Amendment also determines whether Astro was used for an improper purpose under Michigan law. Because the Court's findings that a question of fact remains as to whether the shooting was reasonable, *see* Section B., above, Wynne's argument for dismissal of the conversion claim will be denied as well.

### D.  Intentional Infliction of Emotional Distress

Wynne contends that Plaintiffs cannot recover on the claims of IIED because recovery is not available for "property damage" such as the killing of a family dog. (ECF No. 18, PageID.104)(*citing Preston v. City of St. Clair Shores*, 2015 WL 12516687, at *8 (E.D. Mich. Dec. 31, 2015)); *Koester v. VCA Animal Hosp.*, 244 Mich. App. 173, 624 N.W.2d 209, 211 (Mich. Ct. App. 2000).[1]

Plaintiffs do not address Wynne's arguments for dismissal of the IIED claims. Because dogs are considered "personal property" under Michigan law, Plaintiffs cannot recover damages for emotional distress. *Koester v VCA Animal Hosp* , 244 Mich. App. 173, 624 N.W. 2d 209 (2000). In *Richards,* the court granted summary judgment on the claims of IIED, citing *Koester* in which claims were dismissed

---

[1] But the fact that Plaintiffs are unable to recover for IIED does not prevent them from seeking damages for emotional distress under § 1983.  *See, Moreno v. Hughes*, 157 F. Supp. 3d 687, 689–90, 2016 WL 212932 (E.D. Mich. 2016).

against a veterinarian for noneconomic damages arising from the death of the plaintiff's dog because "'emotional damages for the loss of a dog do not exist.'" *Richards,* at *7 (*quoting* 175, 624 N.W. 2d 209). "[N]o Michigan precedent . . . permits the recovery of damages for emotional injuries allegedly suffered as a consequence of property damage." *Koester*, at 176, 624 N.W. 2d 209.

## IV. CONCLUSION

For the reasons set forth above,

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment **(ECF No. 18)** is GRANTED IN PART and DENIED IN PART. Claims under 42 U.S.C. § 1983 (Count I) and the state law claim of Conversion (Count II) remain. The state law claim of Intentional Infliction of Emotional Distress (Count III) is dismissed.

s/Denise Page Hood
DENISE PAGE HOOD
United States District Judge

DATED: September 30, 2024